**VALLEY CITIZENS FOR A SAFE ENVIRONMENT,**
Plaintiff, Appellant,

v.

**Edward C. ALDRIDGE, et al.,**
**Defendants, Appellees.**

**No. 91–2195.**

United States Court of Appeals,
First Circuit.

Heard April 8, 1992.

Decided July 20, 1992.

1316

Cristobal Bonifaz, Amherst, Mass., for plaintiff, appellant.

Andrew C. Mergen, Atty., Dept. of Justice, with whom Barry M. Hartman, Acting Asst. Atty. Gen., Robert L. Klarquist, Pauline H. Milius, Attys., Dept. of Justice, Douglas J. Heady, Atty., Dept. of Air Force, Washington, D.C., were on brief for defendants, appellees.

Before BREYER, Chief Judge, CYR, Circuit Judge, and STAHL,* District Judge.

BREYER, Chief Judge.

In *Valley Citizens for a Safe Environment v. Aldridge*, 886 F.2d 458 (1st Cir. 1989), we upheld the legal adequacy of an Environmental Impact Statement (EIS) that the Air Force wrote in 1987 before it decided to transfer 16 C–5A transport airplanes from Dover, Delaware, to an air base in western Massachusetts. The Air Force subsequently transferred the airplanes. Then, in 1991, at the time of Operation Desert Storm, the Air Force decided to increase transport activity at the Massachusetts base. In connection with this increased activity, the Air Force prepared two further studies, an Environmental Assessment (EA) and an Air Installation Compatible Use Zone study (AICUZ). After reading the EA and the AICUZ, the plaintiff in *Valley Citizens* moved to reopen that case on the ground that the *new* documents show that the *original 1987 EIS* was seriously flawed. Fed.R.Civ.P. 60(b)(6) ("court may relieve a party ... from a final judgment" for "any other reason justifying relief"). The district court denied the motion. The plaintiff appeals.

A district court will grant a Rule 60(b)(6) motion only if it finds "exceptional" circumstances that justify "extraordinary" relief. *United States v. One Urban Lot*, 882 F.2d 582, 585 (1st Cir.1989) ("Rule 60(b) contains 'extraordinary relief' which should be granted 'only in exceptional circumstances'") (quoting *Lepore v. Vidockler*, 792 F.2d 272, 274 (1st Cir.1986)); *see Ackermann v. United States*, 340 U.S. 193, 202, 71 S.Ct. 209, 213, 95 L.Ed. 207 (1950) ("the circumstances of petitioner ... [are not] so extraordinary as to bring him within ... Rule 60(b)(6)."); *see also Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C.Cir.1980) (upholding granting of 60(b) motion where "previously undisclosed fact ... central to the litigation" shows "initial judgment to have been manifestly unjust"). The Federal Rules grant

broad authority to the district court to determine whether or not those circumstances exist. *See Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co.*, 953 F.2d 17, 19 (1st Cir.1992) ("[m]otions brought under Civil Rule 60(b) are committed to the district court's discretion") (citing cases). Accordingly, we can reverse a decision denying that relief only where we find that the district court acted outside its broad discretion. *See United States v. Parcel of Land and Residence at 18 Oakwood Street*, 958 F.2d 1, 5 (1st Cir.1992) ("We review a district court's denial of post-judgment relief under rule 60(b) only for abuse of discretion.") (citing cases). We can find no such abuse of the district court's powers here.

Plaintiff's central claim was not actually made in the court below. Normally we would not consider it. *Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59*, 953 F.2d at 21 ("absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal") (citing cases). However, in order to avoid significant added expenditure of legal time and effort should plaintiff pursue this argument in further proceedings, and because plaintiff's claim, even if not waived, would not change the result, we shall briefly explain why we find the claim without merit.

Plaintiff's claim that "exceptional circumstances" justify reconsidering a closed judgment rests upon the Air Force having used, in the later EA and the AICUZ, a method for calculating likely "noise disturbance" that differs somewhat from the method used in the earlier EIS. As we understand plaintiff's argument, in the EA, the Air Force calculated the amount of noise that would occur on a typical day by averaging, roughly speaking, the total amount of C–5A noise emitted in a year over $3.23 \times 52$, which is the average number of days per week that the planes would fly, multiplied by 52 weeks. The result is

* Of the District of New Hampshire, sitting by     designation.

the average noise made in a day when C–5A airplanes are likely to fly, assuming they fly *3.23 days* per week. In the original EIS, the Air Force had calculated the amount of noise that would occur on a typical day by averaging the total amount of noise in a year over $5 \times 52$. The result is the average noise made on a day when C–5A planes fly, assuming they fly *five days* each week. The calculation in the EA (that is, $3.23 \times 52$) produced a higher average daily noise level. Indeed, plaintiff says, if one applies the EA's methodology to the period that the 1987 EIS was supposed to cover, one would estimate that the noise would "highly annoy" more than 3000 people. The original EIS predicted the noise would "highly annoy" only about 771 people.

The plaintiff adds that *both* these approaches are wrong. Rather, plaintiff says, the Air Force should have divided the total yearly noise level by the actual number of days in a year, namely 365. And, had the Air Force done so in the initial EIS, it would have produced a number that was so low that everyone could have immediately seen that its entire "noise disturbance" methodology made no sense.

The problem with plaintiff's argument is that we did not uphold the EIS the first time on the ground that the Air Force "noise disturbance" methodology was a perfect, or even a very good, method for predicting just how much noise there would be or how many people that noise would annoy. We simply said that, given the host of uncertainties and difficulties surrounding the creation of such a methodology, we could not "say that the Air Force was unreasonable in using the ... methodology" in the EIS. *Valley Citizens*, 886 F.2d at 469. We stated that, "[a]lthough we approve its use here ... we do not imply that it is immune from criticism or legal attack." *Id.* And, we went on to note that, "the place to attack standard methodology, at least in the first instance, is before the agency, not before a reviewing court." *Id.* We concluded:

> Given the commentators' failure to launch any such attack in their comments [on the EIS], the fact that the

methodology is well accepted, and at least a very rough fit between methodology and problem, we find its use in the final EIS reasonable.

*Id.*

The matters to which the plaintiff points *do not show* that the Air Force's use of its initial methodology in the EIS was unreasonable. An obvious explanation for the difference would be that, in 1987, the Air Force thought the C–5As would fly an average of five days per week, while later experience showed they flew, on average, 3.23 days per week. Regardless, we can find nothing in this change so "exceptional" as to require reopening the case to change our previous conclusion. The plaintiff was not (or should not have been) misled by the original EIS. Plaintiff had the relevant numbers and was able to trace the study's calculations; the EIS stated that the calculations for average noise were "based on 5 days of flying operations per week." The plaintiff had every opportunity to argue that the Air Force should have used a figure of seven days per week, and that such a figure would have shown an incredibly small number of highly annoyed people. Even if the Air Force has changed its view about how best to measure or state such matters, that change does not show that the initial methodology was so seriously flawed in so hidden a way as to provide adequate grounds for requiring a district court to reconsider a final judgment.

We can find nothing else in the plaintiff's other arguments that comes close to providing grounds for reopening. As plaintiff points out, the Air Force has recently decided to prepare a Supplemental EIS (SEIS). But that fact does not indicate that the original EIS was inadequate. The National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321–4361, does not deal specifically with the requirements for preparation of an SEIS, but regulations of the Council on Environmental Quality explain that an agency shall prepare a supplement to an EIS if (1) "[t]he agency makes substantial [relevant] changes in the proposed action;" or (2) "[t]here are signifi-

cant new circumstances or information relevant to environmental concerns." 40 C.F.R. § 1502.9(c)(1). An agency may also prepare an SEIS when it determines "that the purposes of [NEPA] will be furthered by doing so." 40 C.F.R. § 1502.9(c)(2). *See also Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 374, 109 S.Ct. 1851, 1858, 104 L.Ed.2d 377 (1989) (standards for preparation of SEIS). Nothing in these regulations suggests that preparation of an SEIS assumes or reflects that an earlier EIS was not adequate. Here, the Air Force decided to prepare the SEIS once it became clear that actual operations differed significantly from those contemplated at the time the EIS was prepared. This is clearly a proper reason under the regulations, irrespective of the adequacy of the original EIS. *Cf. Stop H-3 Ass'n v. Dole*, 870 F.2d 1419, 1426–27 (9th Cir.1989) (decision to prepare SEIS after EIS approved does not "deprive the ... EIS of its status as a Final EIS").

Similarly, we find nothing of legal significance in the fact that affidavits of those who reside near the air base, as well as the EA, indicate that the EIS significantly underestimated the number of people who would be "highly annoyed" by the C–5A flights. The plaintiff submitted such affidavits the first time. The Air Force readily admits that the *frequency* of C–5A missions has varied from those expected at the time the EIS was prepared. (Indeed, it is precisely for this reason that the Air Force decided to prepare an SEIS.) And, nothing before us suggests the Air Force deliberately misestimated the number of days on which missions would be flown. It is settled law that the reasonableness of an agency action is determined in light of the information before the agency at the time of the decision. *See Valley Citizens*, 886 F.2d at 460 ("The relevant legal question therefore is normally whether the Statement is 'adequate' in light of the information and comments before the agency at the time it produced the Statement.") (citing cases); *Wisconsin Elec. Power Co. v. Costle*, 715 F.2d 323, 326–27 (7th Cir.1983); *see also Camp v. Pitts*, 411 U.S. 138, 142,

93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam).

We express no view on the adequacy of the SEIS, which the Air Force is preparing and which is not before us.

The judgment of the district court is *Affirmed.*